FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

2016 OCT 26  PM 3: 54

CLERK US _____ COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

**TRUDY CALLAHAN,**

     **Plaintiff,**

**vs.**

Case No.:

3:16 cv 1348-J-20JBT

**CITY OF JACKSONVILLE, FLORIDA,**

     **Defendant.**

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Trudy Callahan, brings this action seeking monetary damages, attorney's fees, and costs against Defendant and alleges the following:

1.    This is an action for declaratory relief, and back pay brought on behalf of Trudy Callahan, an employee of the City of Jacksonville. The Plaintiff has suffered violations of her right to be free from employment discrimination on the basis of her sex.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction of this complaint pursuant to 28 U.S.C. §§ 1331 in that the case arises under federal law, specifically, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 20000e, *et seq.*

3.    Venue is proper in the Middle District of Florida pursuant to Section 706(f)(3) of Title VII, 42 U.S.C. § 20002-5(f)(3), because the unlawful employment discrimination giving rise to Plaintiff's claims occurred in this district.

## PARTIES

4.      Plaintiff, Trudy L. Callahan is, and was at all times relevant, an employee of the Jacksonville Sheriff's Office. Plaintiff is female. At all times relevant to the allegations herein, Plaintiff held the rank of lieutenant.

5.      The Defendant City of Jacksonville ("The City"), is a municipal corporation organized under the Charter of the City of Jacksonville Florida. The Jacksonville Sheriff's Office ("JSO") is an agency within the City which provides and carries out the City's police functions.

## FACTUAL ALLEGATIONS

**Incidents of JSO's Selective Disciplinary Policy Prior to Plaintiff's Complaint**

6.      During a meeting held on August 2011, Plaintiff complained to her supervisor, Assistant Chief ("A.C," ) Lendvay that JSO officers had been illegally finding curfew violations for juveniles, resulting in parents of charged juveniles being fined when they should not have been.

7.      In October 2011, Plaintiff received discipline in the form of formal counseling because of a verbal altercation with Chief Tranquille at a Lieutenants' meeting.

8.      On a separate occasion, a male lieutenant, Lt. Sharp shouted at Chief Tranquille during a lieutenants' meeting. Rather than engaging in formal discipline against Lt. Sharp, Chief Tranquille merely told him to calm down and that they could talk.

9.      In December 2011, Plaintiff received another formal counseling for three incidents: arriving approximately ten minutes late to a meeting, turning in an assignment on Monday afternoon instead of Monday morning, not doing a "noteworthy report" on a robbery to a business, and because her squad did not fine enough curfew violators.[1]

---

[1] Note that JSO does not use quotas for curfew violation fines.

10.     On numerous separate occasions, male Lieutenants were late for monthly meetings and not punished.

11.     Further, Lt. Eason and Lt. Elkins, both male lieutenants, did not turn in his assignment on time and Lt. Ayoub, a male lieutenant, did not do a noteworthy report on a robbery to business (which is not required by JSO policy). None of these male lieutenants were disciplined or counseled because of this conduct.

12.     In February 2012, Plaintiff was transferred to a different patrol zone where she was supervised by A.C. Deal and Chief A. Brown.

13.     In May 2012, Chief Brown, filed a complaint against Plaintiff to internal affairs for failing to arrest a suspect on burglary charges when that suspect had only entered the unlocked front porch to take shelter from someone he believed was trying to kill him.

14.     Chief Brown never discussed the alleged violation with Plaintiff or tried to find out additional information before filing the complaint to internal affairs.

15.     In October 2012, Plaintiff received a written reprimand for not attending a lieutenants' meeting and for having her sergeant do roll call. However, the meeting Plaintiff missed occurred while Plaintiff was on approved bereavement leave and it was common practice for lieutenants to delegate roll call duties to a sergeant. Indeed, Lt. Gayle, who is male, had another JSO officer handle his role call in the presence of a Chief.

16.     On or about April, 2013, after being investigated for almost a year, Plaintiff was exonerated of the charges.

17.     In May 2013, a month after Plaintiff was exonerated, Chief Brown filed a complaint via the safety review board against Plaintiff for violations allegedly committed because of Plaintiff's involvement in a vehicle pursuit. The safety review board reviews traffic

3

crashes and police pursuits to determine if violations of JSO policy or Florida law have occurred, and decides whether incidents should be sent to internal affairs for investigation.

18.     Plaintiff's assistant chief found that her actions followed JSO policy and Florida State Statutes. However, the safety review board, of which Chief Brown was a sitting member, sent the complaint to internal affairs,

19.     Plaintiff was also exonerated as to the complaint filed in May 2013.

20.     During this time period, a male lieutenant, J. Short, carried out two police pursuits that violated JSO policy and were sent to the safety review board. However, Chief Brown did not file a complaint against Lt. Short, even though Chief Brown was aware of the violations and both he and his assistant chief found his actions were not in compliance. Another male officer; Chad Harris; was also involved in a vehicle pursuit that was sent to the Safety Review Board because his superiors felt it was out of policy.   No other vehicle pursuit aside from Plaintiffs has ever been sent to internal affairs from the Safety Review Board.

21.     On or about September 2013, A.C. Johnson, Plaintiff's supervisor, approached her and gave her an informal reprimand for comments that she made during a community meeting. The substance of the comment was an attempt to dissuade residents from leaving their car door unlocked by saying that it was like "leaving cake on the counter" in that "roaches would come at night and steal it." Even though Plaintiff had used the analogy on numerous occasions, she was reprimanded because it compared criminals to roaches.

22.     Shortly thereafter, at a meeting before the same group of citizens, a male lieutenant, D.J. Valentine referred to criminals as "thugs, punks, and knuckleheads". A.C. Johnson merely laughed at the comment and did not appear offended.

23.     A.C. Johnson himself during a similar meeting stated that a black male juvenile who was beaten by police deserved his treatment because he was a "thug and a punk."

### Plaintiff's Complaint Against JSO Chiefs for Selective Enforcement of JSO's Disciplinary Policy

24.     On September 26, 2013, Plaintiff filed a complaint against several Police Chiefs with internal affairs regarding the incidents described above.

25.     The complaint indicated that Plaintiff was being harassed and singled out because she was a female who had pointed out JSO's unlawful practices.

26.     On January 30, 2014, Plaintiff also sent a letter to one of the investigators of her complaint, Lt. Oldham.

27.     The e-mail outlined Plaintiff's observations that JSO engaged in a policy of selective enforcement that treated outspoken female officers unfavorably compared to their outspoken male counterparts.

### Plaintiff's Objections to A.C. Johnson's Acts of Discrimination

28.     In May, 2014, a female officer, D. Valentine, approached plaintiff and informed her about an incident that transpired between her and A.C Johnson, wherein A.C. Johnson approached D. Valentine while she was visiting a bar with her husband. D. Valentine reported that A.C. Johnson put his face in D. Valentine's breast area, and moved it back and forth; a practice commonly referred to as "motor-boating."

29.     On another occasion, Plaintiff witnessed A.C. Johnson scream at his female secretary to get him a cup of coffee.

30.     In late-May or early-June 2014, Plaintiff confronted A.C. Johnson regarding the above incidents, as well as other incidents where he displayed disrespectful behavior toward women.

31.     A.C. Johnson then became irate, proceeded to shout at Plaintiff, and told her to mind her own business.

32.     Shortly thereafter, A.C. Johnson called Plaintiff on the phone, berated her and cursed at her for her decision to deploy reserve officers to catch children who were riding golf carts at night and destroying golf course greens.

33.     Later that week, two of Plaintiff's male co-workers, Lt. Highcove and Sgt. Short utilized reserve officers in the same deployment, but were not berated for their decision.

### Plaintiff's Transfer to Day Shift

34.     During the incidents described above, and for the past eight years of her employment at JSO, Plaintiff worked on the Gold Midnight shift.  After 10 P.M., JSO pays an additional 3.75% per hour shift differential.

35.     Additionally, the midnight shift is more desirable to Plaintiff than the day shift, because during the day Plaintiff cares for her elderly mother and accompanies her to doctors' appointments.

36.     On June 20, 2014, approximately three weeks after Plaintiff complained about A.C. Johnson's behavior, she received a phone call informing her that she would be transferred to the Zone 1 Dayshift Blue.

37.     Plaintiff explained that she needed to work the night shift because she needed to care for her mother, but was told that it was "too bad" and there was nothing Plaintiff could do to change the issue.

38.     Plaintiff was also told to report to Undersheriff Senterfitt if she had an issue with the transfer.

6

39.     Plaintiff asked why she should not take the issue up the chain of command, which would have included A.C. Johnson. Plaintiff was told that her chain of command was on "the same page" about her.

40.     Plaintiff was transferred off the midnight shift approximately three weeks after she confronted A.C. Johnson about his disrespectful actions toward women. It was also less than a year after she filed her complaint against the JSO chiefs for disciplining her on the basis of her sex, and approximately one month after internal affairs finished their investigation into the chief's behavior.

41.     Plaintiff was also not given a reason for her transfer. She was expressly told that the transfer was not related to work performance or a personality conflict. Furthermore, there were not any senior officers who desired her shift.

42.     Plaintiff was the only female supervisor in her patrol zone. After she transferred, she was replaced with a male lieutenant, who indicated to Plaintiff that he wanted to work the day shift, rather than the night shift.

43.     Lt. Larry Kitchen's, who is male, has had just as many if not more complaints on file with internal affairs than the Plaintiff has and he was not moved off his night shift 1230-2355.

44.     On July 17th, 2014, Plaintiff set up a meeting with her former supervisor, Chief Cook regarding her transfer. Plaintiff explained that she needed to work the day shift in order to take care of her elderly mother. Plaintiff also produced a doctor's note explaining Plaintiff's mother's condition.

45.     Plaintiff explained at the meeting that she felt that she was transferred for discriminatory reasons.

46.     Chief Cook promised to transfer Plaintiff back to the Night Shift on January 1, 2015 when a position would be available, if Plaintiff did not file a complaint.

47.     In January, 2015 Plaintiff was not placed back on the midnight shift and was once again told to contact the undersheriff if she had any issues.

**ACTS OF RETALIATION FOLLOWING PLAINTIFF'S EEOC COMPLAINT**

48.     On February 5, 2015, Plaintiff timely filed a charge with the Equal Opportunity Employment Commission (EEOC).

49.     On March 19, 2015 during a combined roll call, Chief Hackney, one of Plaintiff's superiors, pulled Plaintiff outside in front of the members of JSO. Chief Hackney berated Plaintiff for having her phone out during roll call.

50.     When Plaintiff looked up, she noticed A.C. Ayoub, a male assistant chief, chief Cook, and A.C. Johnson texting on their cell phones during the roll call. None of these chiefs or assistant chiefs were disciplined or pulled aside for using their phones during roll call.

51.     A.C. Ayoub then confronted Chief Hackney, and told Chief Hackney that he and other members of JSO regularly used their phones during roll call, and that it was wrong to single out Plaintiff during the roll call to embarrass her.

52.     On July 15, 2015 Plaintiff, while attending a Fraternal Order of Police meeting, was approached by Undersheriff P. Ivey questioned Plaintiff regarding the status of her EEOC complaint in a group setting around strangers, subordinates, and fellow co-workers. Ivey, who at the time held the rank of Chief, then told Plaintiff that he was going to be undersheriff soon and that he just wanted to know what was going on in the lawsuit.

53.   On information and belief, Chief Ivey engaged in the conversation to intimidate and publicly embarrass Plaintiff. After 5-10 minutes, Plaintiff had to leave the meeting because she was so embarrassed.

54.   On May 5, 216, an anonymous complaint was filed with the JSO Office of Integrity regarding inappropriate comments that Plaintiff allegedly made.

55.   The Office of Integrity only generally investigates criminal acts committed by police officers. However, nothing in the anonymous complaint alleged that Plaintiff did anything that constituted a crime.

56.   The Office of Integrity reports to Undersheriff Ivey and Sheriff Mike Williams.

57.   Because of the complaint, the Office of Integrity, without Plaintiff's knowledge, placed a GPS tracking device on her patrol car.

58.   The Office of Integrity generally will only place GPS trackers on an officer's car if that officer is suspected of engaging in serious criminal activity. It is unheard of to track an officer's car simply because that officer made inappropriate comments.

59.   Further, the nature of Plaintiff's job duties and rank allow her to attend to personal matters while she is on duty, so long as she can respond to calls.  Thus, the GPS tracker recorded Plaintiffs' movements not just when she was responding to calls, but also when she was attending to personal matters such as going to the gym and caring for her mother.

60.   Tracking Plaintiffs movements was a gross violation of her privacy rights, not justified by the accusations against her, that was carried out to retaliate against her for her complaints against JSO.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

61.     Plaintiff has exhausted her administrative remedies. On February 5, 2015,

Plaintiff timely filed a charge with the Equal Opportunity Employment Commission (EEOC).

62.     The EEOC issued a letter of determination on July 29, 2016.

## COUNT I:
## RETALIATION IN VIOLATION OF TITLE VII

63.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1-61 as

though fully set forth herein.

64.     Plaintiff engaged in conduct protected by Title VII by filing a complaint with

internal affairs alleging sex discrimination in JSO's disciplinary practices and by complaining to

A.C. Johnson regarding his harassment of women.

65.     As a direct result of Plaintiff's complaints, the City transferred Plaintiff to the day

shift.

66.     The City, through its agents, intended to discriminate against Plaintiff in

retaliation for her complaints.

67.     As a direct and proximate result in the City's actions, Plaintiff has suffered an

adverse employment action by being placed on a shift with lower pay and less-desirable hours.

Further, Plaintiff's retirement benefits are calculated based on her salary during her final two

years. Given that Plaintiff has decided to retire within 2-years of her transfer, the shift

differential also impacts her retirement benefits.

68.     As a direct and proximate result of the City's actions, Plaintiff has suffered

damages including but not limited to monetary loss, mental anguish, damage to her reputation,

loss of dignity, and emotional distress.

10

WHEREFORE, Plaintiff demands the following relief against the Defendant City of Jacksonville:

1.     Actual and compensatory damages;

2.     An award of attorney's fees and costs; and

3.     Any other relief this court deems just and proper.

## COUNT II:
## HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

69.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1-43 as though fully set forth herein.

70.     Plaintiff has been the subject of unwelcome harassment because she is female.

71.     The harassment, which includes shouting, pursuing non-meritorious disciplinary actions against Plaintiff, and transferring Plaintiff to the day shift against her will, is sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

72.     The City, through the actions of its employees, is responsible for such an environment.

73.     As a direct and proximate result of the City's actions, Plaintiff has suffered damages including but not limited to monetary loss, mental anguish, damage to her reputation, loss of dignity, and emotional distress.

WHEREFORE, Plaintiff demands the following relief against the Defendant City of Jacksonville:

1.     Actual and compensatory damages;

2.     An award of attorney's fees and costs; and

3.     Any other relief this court deems just and proper.

## COUNT III:
## RETALIATORY HOSTILE WORK ENVIRONMENT IN VIOLATION
## OF TITLE VII

74.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1-43 as though fully set forth herein.

75.    Plaintiff engaged in conduct protected by Title VII by filing a complaint with internal affairs alleging sex discrimination in JSO's disciplinary practices and by complaining to A.C. Johnson regarding his harassment of women.

76.    Plaintiff has been subject to unwelcome harassment as a result of engaging in protected conduct, in violation of Title VII. *See Gowski v. Peake*, 682 F.3d 1299 (11th Cir. 2012).

77.    The harassment, which includes transferring Plaintiff to the day shift against her will, confronting her about her complaint, and placing a GPS tracker on her car, is sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment.

78.    The City, through the actions of its employees, is responsible for such an environment.

79.    As a direct and proximate result of the City's actions, Plaintiff has suffered damages including but not limited to monetary loss, mental anguish, damage to her reputation, loss of dignity, and emotional distress.

WHEREFORE, Plaintiff demands the following relief against the Defendant City of Jacksonville:

1.     Actual and compensatory damages;

2.     An award of attorney's fees and costs; and

3.     Any other relief this court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues so triable.

DATED this 26TH day of October, 2016.

Respectfully submitted,

Wm. J. Sheppard, Esquire
Florida Bar No.: 109154
Elizabeth L. White, Esquire
Florida Bar No.: 314560
Matthew R. Kachergus, Esquire
Florida Bar No.: 503282
Bryan E. DeMaggio, Esquire
Florida Bar No.: 055712
Jesse B. Wilkison, Esquire
Florida Bar No.: 118505
Sheppard, White, Kachergus & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:        (904) 356-9661
Facsimile:        (904) 356-9667
Email:            sheplaw@att.net
COUNSEL FOR PLAINTIFF

ldh[Callaghan.trudy.complaint]

14