UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TRUDY CALLAHAN,

        **Plaintiff,**

vs.                            **Case No.: 3:16-cv-01348-HES-JBT**

CITY OF JACKSONVILLE, FLORIDA,

        **Defendant.**

_____

**PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT (DOC. 30)**

      Plaintiff, Trudy Callahan, brings claims under Title VII against the City of Jacksonville for sex discrimination, hostile work environment, retaliation, and retaliatory hostile work environment. Callahan was singled out from male employees throughout her career and selectively disciplined her for conduct for which her male colleagues also engaged and were not disciplined. When Callahan complained about the discrimination she faced, her superiors responded by transferring her to a less-desirable, lower-paying shift and bringing spurious investigations and disciplinary charges against her.

     **I.**        **STATEMENT OF FACTS**

     **A.**        **Callahan's Employment and Duties at JSO**

      Callahan is an employee of the City of Jacksonville, specifically the Jacksonville Sheriff's Office ("JSO"). Doc. 31-1 "Callahan Depo" at 9. Callahan started working as a law enforcement officer for JSO on March 20, 1994 after graduating from the police academy in 1993. Callahan's current position with the City of Jacksonville is a patrol lieutenant. *Id.* at 35.  She has held the rank of Lieutenant since 2011. *Id.* at 28. As a patrol Lieutenant, Callahan is responsible for supervising

an entire shift or "watch" in a particular geographic area of the City, known as a "zone." *Id.* at 40-42.

Her duties include responsibility over roll call at the beginning of the shift, disseminating information to officers on her shift, attending community meetings, as well as monitoring and mentoring the law enforcement officers in her squad. *Id.* at 35–39. Lieutenants do not, as a matter of course, personally patrol their zones or respond to calls unless there is a major incident, such as a plane crash, police pursuit, or discharge of a firearm. Declaration of Trudy Callahan at ¶2, attached as Exhibit 1.

**B.      JSO's Procedures for Investigating and Punishing Rule Infractions**

Generally speaking, there are three ways that JSO can respond to allegations to misconduct. Low-level matters may be referred to an officer's supervisor to counsel the employee and quickly dispose of the issue.    More serious matters may be reported to and investigated by the internal affairs unit. Doc. 31-1 "Callahan Depo" at 67. Finally, the most serious offenses are sent to the integrity unit, which investigates possible criminal conduct. *Id.* at 68.

JSO has many policies that explicitly define some acts of misconduct. However, some of forms of misconduct are not clearly defined and are largely left to subjective discretion of the officer's supervisor or the officer in charge of investigating the case. Ex. 1 at ¶ 4. These more nebulous offenses include violations such as "unbecoming conduct" or "failure to conform to work standards." *Id.* As such, JSO's rules and regulations are such that any JSO officer could be written up for a minor violation on any day if their superiors set their mind to do so. Doc. 31-1 "Callahan Depo" at 66.

If an officer is found to have committed misconduct, JSO may respond in one of several ways. First, it can issue discipline, including termination, suspension, or a written reprimand.

Disciplinary infractions are notated on a permanent disciplinary record, called a concise disciplinary history, which can be accessed by the officer's supervisors or members of the public. Doc. 31-1 "Callahan Depo" at 88. JSO also uses a progressive discipline system where punishments become more severe the more infractions an officer accumulates. *Id.* at 94. If an officer reaches a certain level of infractions, they are denied step-raises given to other officers. Doc. 31-1 "Callahan Depo" at 106.   Finally, any disciplinary actions that may impact an employee's pay or that results in a suspension must be approved by the Sheriff or his designee. Doc. 31-6 "Ivey Depo" at 28.

Second, JSO may issue formal counseling. which involves the officer's supervisor talking to the officer regarding the violation and having the officer sign a written acknowledgement that the violation occurred. Doc. 39-1 "Callahan Depo" at 46. While formal counseling is not technically considered discipline under JSO's rules, a formal counseling counts as an infraction in JSO's progressive discipline system and in prior years also has appeared on an officer's concise disciplinary history. Doc. 131-1 "Callahan Depo" at 88, 94.

Third, JSO may issue informal counseling to an employee. Like formal counseling, informal counseling involves the officer's supervisor counseling them regarding the rule infraction. Doc. 31-1 "Callahan Depo" at 46**.** However, unlike formal counseling, informal counseling is not recorded, does not appear in an officer's concise disciplinary history, and does not count as discipline in JSO's progressive discipline policy. *Id.* at 88, 105.

Even if the underlying allegations are ultimately not sustained, an investigation by the internal affairs or integrity unit is a stressful process that can last ver six months and involves interrogation of the officer, interviews of their colleagues, and close monitoring of the officer's whereabouts and actions while on the job. Ex.1 at ¶6. In recognition of this fact, the Florida

3

Legislature enacted the "Law Enforcement Officers' and Correctional Officers' Bill of Rights" which affords them certain protections during this process. *See* § 112.532 Fla. Stat. (2018). For example, an officer under investigation must be informed of the names of all complainants. *Id.* at §112.532(d).

### C.     Disparate Treatment and Discipline Prior to Callahan's Complaint

Throughout Callahan's twenty-four-year career at JSO, she has been treated differently from her male colleagues in JSO's disciplinary system. Ex. 1 at ¶4. This disparate treatment has included: (1) referring matters that are not rule violations to internal affairs or integrity for investigation when male officers engaged in the same conduct and were not investigated; or (2) imposing more severe discipline on Callahan for conduct in which male officers engaged who were not disciplined as severely or not disciplined at all. *Id.* at ¶ 5. These incidents include[1]:

- Around 1998, Callahan's neighbor caught two JSO officers breaking into and exiting Callahan's home while she was at work and shortly after she made a complaint about harassment she was receiving from a male supervisor. Doc. 31-2 at 176. One of the officers later confessed to Callahan that he was ordered to break into her home to search for anything that could be used to fire her. *Id.* at 176. The officer further told her "but we drew the line when they wanted us to plant drugs or contraband in your police car to give them an excuse to arrest you and get rid of you." *Id.*

- In 2011, Callahan made a curt comment to Chief Tranquille after the Chief made a derogatory comment toward Callahan. Ex. 2 at 9. Callahan received a formal counseling as a result of the incident. *Id.* Around the same time, a male officer shouted at the same JSO chief during a meeting and was simply told by that chief to calm down. Doc. 31-1 at 93.

---

[1] Plaintiff's interrogatory responses, attached as Exhibit 2, contain a more exhaustive list of twenty-six incidents where Callahan was subject to spurious disciplinary investigations or received discipline that was harsher than male officers who engaged in the same conduct.

- In 2012, Callahan did not attend a Lieutenants' meeting because the meeting occurred while she was on bereavement leave as a result of the passing of her uncle. Ex. 2 at 17. Callahan's leave was approved in advance of the meeting. *See* composite bereavement leave documents attached as Exhibit 3. Callahan's Assistant Chief falsely wrote in her written reprimand that Callahan had "forgotten about" the meeting, when in fact she had been approved for time off to help her family in the wake of her uncle's death. Doc. 31-1 "Callahan Depo" at 122."

- In 2013, JSO Chief Brown, acting as head of the Safety Review Board, referred a police pursuit in which Callahan was involved to internal affairs for possible policy violations committed during the pursuit. Ex. 2 at 11. The Safety Review Board is an entity that reviews crashes and pursuits to determine if JSO policy was followed. Doc. 31-1 "Callahan Depo" at 136. It is ultimately in the discretion of the Chief sitting on the Board whether pursuits they review are referred to internal affairs or integrity. In both of the pursuits, Callahan's supervisor determined that she did <u>not</u> violate JSO policy during the pursuit. *See* Composite Safety Review Board Reports, attached as Exhibit 4. Callahan's was the first pursuit that the Safety Review Board ever sent to internal affairs. Ex. 2 at 11. However, in two other pursuits involving male officers, their supervisors found that they <u>did</u> violate JSO policy, but the Safety Review Board elected <u>not</u> to send their pursuits to internal affairs for investigation. *Id.*; Ex. 4.

In addition to the discipline and investigations, Callahan personally experienced a culture of harassment because of her sex and has witnessed other female officers being similarly mistreated.[2] For example, in 1998 Callahan's male supervisor frequently made comments to her asking her to go to dinner and would brag to her about being an underwear model. Doc. 31-1

---

[2] Plaintiff's Interrogatory responses, attached as Exhibit 2, contain a list of thirteen other incidents of female officers that have brought incidents to Callahan's attention or that Callahan witnessed. *See* Ex. 2 at 20–25.

"Callahan Depo" at 74. When Callahan complained, her supervisors took her out of the field and sent to the Teleserve call unit. *Id.*

Around 2006, a fellow Sergeant and several officers were singing and playing a guitar in another room. *Id.* Callahan later discovered the lyrics to the song and that the song was about her being a "whore." *Id.* at 74–75. Additionally, throughout Callahan's career, male officers have been pulled into her supervisor's office and asked if they were sleeping with Callahan. *Id.* at 75. Furthermore, Callahan would frequently see high-ranking male officers refer to female officers in a sexually-demeaning way, for example Undersheriff Patrick Ivey Sr. nicknamed an officer "juicy," in reference to her buttocks. Doc. 31-2 "Callahan Depo" at 33.

**B.      JSO's Frivolous Integrity Investigation in Response to Callahan's Threats to File a Complaint.**

In the summer of 2013 Callahan grew frustrated with the way that her superiors were using the disciplinary system against her. On July 23, 2013, Callahan called Assistant Chief Mike "Buck" Johnson to discuss the most recent incident with the safety review board. Ex. 1 at ¶ 9. Callahan stated that she had learned her pursuit, for which no violations were found, were being sent to internal affairs for investigation. *Id.* Callahan informed him that she would file a complaint if JSO continued to harass her with frivolous disciplinary investigations. *Id.*

The next day Johnson sent a complaint to the integrity unit alleging, without evidence, that Callahan was having sexual relations while on duty. *See* Declaration of Casey Bennett, attached as Exhibit 5; Integrity File 2013-40, attached as Exhibit 6. The officers assigned to the investigation were told "we need to get this done, because Trudy is going to sue Assistant Chief Bobby Deal." Ex. 6 at ¶ 5.

Pursuant to Johnson's instructions, the Integrity Unit conducted "detailed surveillance" on Lt. Callahan for four weeks. Ex. 5 at 1. The only purported basis or the investigation was that

6

Callahan spent "excessive hours" at The Preserve San Jose Condominiums during her working shift. *Id.* The complaint contained no mention of the fact that this location was a "stop station" used by all of the Officers in Callahan's zone to eat, use the bathroom, or write reports between calls. Ex. 1 at ¶ 10. Given that Callahan was a Lieutenant whose job description does not include routine patrolling or responding to calls, she was permitted and indeed encouraged to post at stop stations to effectively supervise the officers under her command. Ex. 1 at ¶¶10, 11.

**C.     Callahan's Discrimination Complaint**

Per JSO policy, an employee can make a complaint for discrimination or harassment with EEOC or the Internal Affairs unit. Doc. 31-1 "Callahan Depo" at 72. On January 30, 2014, Callahan sent an e-mail to internal affairs investigator, Lt. Oldham clarifying she was raising claims of sex discrimination. *See* e-mail from Trudy Callahan to Johnathan Oldham dated January 30, 2014, attached as Exhibit 7. The e-mail stated, in relevant part:

> Yes, I believe that me being a female has a lot to do with the treatment that I have received. I have been treated differently than male officers on three separate occasions prior to 2011 by Chief Tranquille. I definitely believe those incidents were because I was female, and I have no doubt I am not the only female who feels this way. . . I think it has definitely been a longstanding issue especially with outspoken females and our treatment compared to outspoken male counterparts.

*Id.* The investigation into Callahan's complaint concluded in April 2014. Doc. 31-1 "Callahan Depo" at 158.

In addition to this formal complaint, Callahan had witnessed or learned of several instances of sexist behavior by one of the subjects of the Complaint, JSO Chief Johnson. Doc. 31-1 "Callahan Depo" at 153.  Specifically, while Chief Johnson was off-duty, drinking at a bar, he pushed his face into the breasts of a female officer. *Id.* at 152. In another incident, Callahan witnessed Chief Johnson scream at his secretary to get him a cup of coffee at a JSO substation. *Id.*

In late May or early June 2014, Callahan brought these incidents to Chief Johnson's attention, and expressed that she felt they were inappropriate. *Id.* at 154.

### D.      Callahan's Transfer to Day Shift

On June 26, 2014, Callahan received notice that she was being moved from her ordinary shift working midnights onto the day shift. Ex. 1 at ¶ 12.  Officers assigned to a midnight shift are entitled to a 3.75% increase in pay. *Id.* Additionally, the move to day shift caused Callahan significant hardship because she cares for her eighty-four-year-old mother during the day. *Id.* Callahan's mother lives with her at her home in Jacksonville. Doc. 31-1 "Callahan Depo" at 13. She suffers from scleroderma, a condition resulting from an overproduction of collagen that impairs mobility and makes certain every-day tasks difficult. Doc. 31-2 "Callahan Depo" at 6. At the time, no one else was living in the house and Callahan was the only person available to assist her with everyday activities or take her to medical appointments. *Id.* Numerous other officers have been given an opportunity to move to the day shift to accommodate family hardships. Doc. 31-2 "Callahan Depo" at 179.

Callahan informed her immediate supervisors, Assistant Chief Ayoub and Chief Cook of this hardship and also sent an e-mail to Undersheriff Senterfitt explaining the situation. *See,* Hardship E-mail to Undersheriff Senterfitt, attached as Exhibit 8. On July 17, 2014 Callahan attended a meeting with Chief Ayoub and Chief Cook and repeatedly inquired whether there were any issues with her performance that caused the transfer. Ex. 2 at ¶13. They both assured her that the transfer was not due to poor work performance. *Id.* In fact she was told that the reason was because Callahan was good at handling community meetings and they needed a good lieutenant to handle those meetings. Doc. 31-2 "Callahan Depo" at 17–18. Instead, Callahan was told to wait six months to see if the day shift would work out for her. *Id.* When she re-applied for the midnight shift, she was again denied. *Id.* When Callahan moved, another lieutenant on the midnight shift

was moving to day shift to take the position of another day-shift lieutenant who was retiring. *Id.* Callahan had the most seniority of any of the officers eligible for the shift. *Id.* Despite her hardship and seniority, she was not given the position. *Id.*

The decision-maker regarding Callahan's transfer, Undersheriff Senterfitt, claims that he transferred her because he had received complaints that she was spending an excessive amount of time at a substation, that she had requested additional training that could better be provided on the day-shift, and that she had been counseled a number of times by her supervisors about a number of (unspecified) issues. Doc. 31-10 at ¶¶ 5–6. As noted above, Lieutenants are encouraged to post at stop stations and substations in their shift because they do not routinely patrol or respond to calls outside of a major incident. Ex. 1 at ¶10. Callahan did not violate any policy by spending time at substations or stop stations, nor did her spending time there affect her ability to respond to major incidents. *Id.* Indeed, Callahan's performance evaluations during that time indicate that she exceeded expectation in responding to major incidents and her interactions with the community. *See* Composite Performance Evaluations, attached as Exhibit 9. Further, the only training Callahan requested was denied because of budgetary issues, not the shift she occupied. Ex. 1 at ¶13. Even once she was moved to the day shift, she was not permitted to go on the training. *Id.*

Furthermore, Callahan remained on the day shift for ten months after the Integrity Unit investigated her for spending excessive time at a stop station. Compare Ex. 5 with Doc. 31-10 at ¶ 5. By contrast, Callahan's transfer occurred one month after Callahan protested Johnson's inappropriate conduct toward women, two months after internal affairs had finished investigating her sex discrimination complaint, and five months after she formally raised claims for sex-discrimination. *See*, Ex. 87 Doc. 31-1 "Callahan Depo" at 158.

**E.      Callahan's EEOC Complaint and JSO's Response**

On February 5, 2015, Callahan filed a charge raising, *inter alia*, claims of sex discrimination and retaliation. *See* EEOC Charge, attached as Exhibit 11. In May 2015, the City of Jacksonville elected a new sheriff, Mike Williams. Around that time, the Sheriff publicly announced that Chief Patrick Ivey Sr. would serve as undersheriff. Doc. 31-6 "Ivey Depo" at 28.

In June 2015, Callahan and Ivey attended a Fraternal Order of Police meeting. Despite both officers having long careers with JSO, Ivey had only spoken to Callahan on one prior occasion*.* at 13**.** While Callahan was waiting in line to enter the meeting, Ivey confronted her and stated, "I know you put in for Gayle's [day shift] spot." Doc. 31-2 "Callahan Depo" at 26. He then stated, "you're suing me, right, Trudy? You are suing the sheriff's office. So, you're suing me." Doc. 31-11 "Soehlig Depo" at 25. Ivey said that in earshot of Callahan's colleagues at the meeting. *Id.* A bystander to the encounter noted that Ivey's tone was confrontational. *Id.* at 24.

### F.      Further Unwarranted Discipline and Investigations

Rather than abate the issue, Callahan's charge only exacerbated the selective discipline and spurious investigations at JSO. These included:

- On January 19, 2016, internal affairs initiated an administrative investigation into Callahan for a series of social media posts that contained racial jokes based on a complaint that Ivey filed after receiving a text-message from an administrative assistant alerting him to the messages. Doc. 21-5 at 159. Callahan was not the author of the posts but had shared them on her personal Instagram account several months prior. *Id.* Ivey reviewed the IA report personally and issued Callahan a ten-day suspension and a level 2 written reprimand. Doc. 31-6 at 180.

Between January and March 2016, a male officer, T.L. James authored a series of violent posts on his Facebook account such as "Yep It's that kinda night already. Someone's getting a size 13 boot to the ass tonight. I can feel it." *See* Internal Affairs File #16-00195, attached as Exhibit 11.

The case was referred to James's supervisor who issued a level one reprimand and did not suspend James. *Id.* at 3. In December 2017, the press reported that a male undercover officer made an inappropriate comment about a criminal defendant being raped when he stood up in court and said the defendant going to have "a tough time in jail." Doc. 31-6 at 181–82. He then stood up and removed a packet of KY personal lubricant and said, "You are going to need a lot of this." *Id.* This officer was never investigated or discipline for unbecoming conduct for these comments. Doc. 31-6 "Ivey Depo" 28.[3]

- On May 18, 2016, Ivey filed a complaint against Callahan had told an inappropriate "your Momma joke" to one of her officers during an "extended" checkoff. Doc. 31-6 at 236. A "checkoff" is a period at the end of an officer's shift where they hand their paperwork in to a sergeant and exchange information. Ex. 1 at ¶ 17. While Callahan ordinarily does not attend checkoffs, she was present at this particular checkoff to assist her officers in preparing response to resistance reports that had contained errors. *Id.* The participants in the conversation noted that everyone in the squad "jokes around" and described the comment as "your typical check-off banter." Doc. 31-6 at 203, 205, 223. Indeed, the officer who was the butt of the joke stated that the officers made these jokes all the time and that it was nothing he ever took personal. Doc. 31-6 at 208. The complaint was reported as "anonymous" in contravention to The Law Enforcement and Corrections Officers Bill of Rights, which requires the subjects of an investigation to be informed of the name of the complainant. § 112.532(1)(d) Fla. Stat.

Ivey learned of the incident from his son, who was working in Callahan's squad for the first time that night. Ex. 1 at ¶ 17. Ivey chose to file the complaint with the Integrity Unit and

---

[3] When asked about the officer's conduct, Ivey said he did not believe the comment related to rape and inquired as to whether the defendant's sexual orientation was known. *Id.* at 62–63.

Internal Affairs. Doc. 31-6 "Ivey Depo" at 115, 122. As a result of the Complaint, a GPS tracker

was placed on Callahan's vehicle. Lieutenants are encouraged to take their vehicles home in the

event they witness a crime off duty. Ex. 31-1 "Callahan Depo" As such, the GPS tracker surveilled

Callahan's movements both while she was on and off duty.

This action was highly unusual given that the only part of the allegation pertaining to

Callahan's location was that one check off conducted in Callahan's zone had lasted an extended

period of time. However, Ivey acknowledged that there is no set period of time in which checkoffs

must be completed. Doc. 31-6 "Ivey Depo" at 110. The night in question was the first that Ivey's

son had worked with Callahan's squad, and thus he had no knowledge of how long check offs

ordinarily took in Callahan's zone. Ex. 1 at ¶18. The GPS tracker also had no investigative utility

toward Ivey's allegations, since the location where checkoffs take place are within Callahan's zone

(an area she is permitted to be during her shift) and the tracker would not have relayed the location

of the officers who were participating in the checkoff. [4]

## II.    **ARGUMENT**

### A.    **Summary Judgment Standard**

---

[4] Between 2014 and 2017, the JSO integrity unit had only tracked sixteen officers with a GPS tracker, including Callahan. *See* Ex. 1 at ¶ 19; Composite GPS Tracker summations, attached as Exhibit 12. Of those sixteen complaints, seven were for criminal conduct, two were for citizen complaints of officers having sex on duty, two were for secondary employment violations, and only four were related to work attendance. *Id.* Of the four related to work attendance, two were for officers who were accused of failing to show up for patrolling, one was for a sergeant who was accused of not responding to calls and leaving his zone to go to his residence, and one was for a lieutenant who was accused of not responding to calls and leaving his zone. *Id.* Callahan was the only officer in the time period surveyed whose movements were tracked without any allegations that she was leaving her zone or failing to respond to calls. *Id.* Furthermore, Callahan was tracked *twice* within a three-year period and in neither instance was she accused of failing to respond to calls or leaving her zone. *Id.*

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

### B.     Hostile Work Environment

To prove a prima facie case of hostile work environment, a plaintiff must establish:

> (1) he or she belonged to a protected group, (2) he or she was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his or her employment and create an abusive working environment, and (5) a basis exists for holding the employer liable.

*Gupta v. Fla. Board of Regents*, 212 F.3d 571, 582 (11th Cir.2000).

### 1.     Severe or Pervasive Harassment

"Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keeping them from advancing in their careers." *Harris v. Forklift Systems, Inc.* 510 U.S. 17 (1993). Regarding the subjective component, Callahan testified that the acts of harassment she faced caused severe hardship and mental distress. Specifically, she described a constant state of "being looked at under a microscope and just always screwed with and having to watch everything you do and walk tightrope." Doc. 31-2 "Callahan Depo" at 46.  The severe stress also manifested physically, as he exhibited symptoms like gallstones. *Id.* at 46.

In determining whether a work environment is objectively hostile, courts should consider: "(1)" the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct

unreasonably interferes with the employee's job performance." *Id.* Courts must look at the totality of the circumstances rather than focus on a single factor exclusively. *Cf. Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.")

Courts have recognized that unwarranted or disparate discipline can form the basis of a hostile work environment claim. *See Vance v. Southern Bell Tel. and Tel. Co.*, 863 F.2d 1503 (11th Cir. 1989) *abrogated on other grounds by Harris v. Forklift Systems, Inc.* 510 U.S. 17 (1993). In *Vance,* the Eleventh Circuit overturned a directed verdict in a racial harassment case where the plaintiff had presented evidence of two incidents where a noose was hung at her work, that she had received discipline on two occasions that were not given to white employees, and where her employer had failed to honor a request to be transferred to a certain hospital. *Id.* at 1512.

The court found that viewing all of this evidence in context, the Plaintiff had satisfied her burden to create a jury question on her hostile work environment claim. *Id. See also Shockley v. HealthSouth Central Georgia Rehabilitation Hosp.*, 293 Fed. Appx. 742 (11th Cir. 2008) (denying motion to dismiss where plaintiff alleged her supervisor frequently made racially charged comments to her and she was put on probation for her attendance problems while white employees with attendance problems only received verbal counseling); *Oden v. Southern Ry. Co.*, 1984 WL 48881; no. 82-751-A (N.D. Ga. 1984) (finding plaintiff stated claim for hostile work environment where plaintiff was subject to disparaging comments and unfounded allegations of unsafe work practices).

14

The City attempts to limit Callahan's claims by characterizing them as a few rude comments by supervisors and sporadic instances of discipline. It presents a selective view of Callahan's claims that ignores much of the evidentiary record. Specifically, the elements that make up Callahan's hostile work environment include: (1) sexually derogatory name-calling of Callahan and other female officers, including multiple occasions where Callahan's co-workers referred to her as a "whore", (2) over twenty-five instances where Callahan was subject to frivolous or gender-disparate disciplinary charges and investigations, which included months of surveillance and one occasion breaking into Callahan's house (3) denying Callahan's request for a transfer to night shift, despite having seniority and a position being available, and refusing to accommodate her hardship to take care of her mother.

The City relies on *Davis v. Town of Lake Park*, 245 F.3d 1232, 1240-1241 (11th Cir. 2001) to argue that counseling or criticism of an employee's performance is not actionable under Title VII. Doc. 30 at 16. However, the plaintiff in Davis did not raise a hostile work environment claim, so the only issue the court addressed was whether the performance criticisms were an adverse employment action. *Id.* at 1245. As such, its analysis is not relevant to Callahan's hostile work environment claim. In any event the criticisms at issue in *Davis* were two counseling memoranda" that merely criticized the plaintiff's work performance, which were not discipline and more akin to negative job evaluations. *Id.* at 1240–41.

JSO's use of its disciplinary procedures against Callahan were of an entirely different character. The disciplinary charges brought against Callahan involved lengthy internal affairs investigations, which frequently lasted more than six months, where her fellow officers interrogated her, interviewed her peers, and scrutinized her employment actions. Her superiors further skirted procedural protections that Florida Law provides to law enforcement officers to

prevent disciplinary abuses by approaching integrity or internal affairs as an "anonymous" complainant. In several instances, frivolous charges were brought to the attention of the Integrity Unit, a body that investigates and searches for criminal violations. In two instances, Callahan was surveilled for over a month by the Integrity Unit without any allegations of criminal activity or rule violations. In one instance, officers broke into her home.

2.     Because of Sex

In order to prevail on a hostile work environment claim, Callahan must show that the adverse treatment she received was based on sex. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). The City contends that Callahan has not shown that the actions she complained of were based on sex because, unlike her male comparators, Callahan was on probationary status during one of the incidents. While this may explain one of the twenty-six instances of disparate or frivolous discipline she identified, it fails to account for the numerous instances where Callahan was disciplined more severely than her male colleagues when she was not on probationary status.

For example, the Safety Review Board sent Callahan's pursuit to the Integrity Unit for investigation, even though her supervisor found she did not commit a violation, while her male colleagues were not sent to integrity for review when their supervisors found they did commit violations. Callahan was disciplined for a domestic dispute, when her male colleagues who also had been involved in domestic disputes (including an officer in the same dispute as Callahan) did not receive discipline. Callahan received an informal counseling for complaining about new computer equipment when male employees who raised the same complaints did not receive counseling. Doc. 32-1 "Callahan depo" at 133.

16

In any event, a "plaintiffs' failure to produce a comparator does not necessarily doom a plaintiff's case. *Smith v. Lockheed Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011). A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker" *Id.* (quotation omitted). In *Smith*, the Eleventh Circuit found that an employee had met that burden by showing that his employer's zero tolerance policy was not employed in the same way toward black employees as white employees. *Id.*

Here, even in those instances where Callahan has not pointed to comparators, the other evidence in this case creates a triable issue of fact as to whether her treatment was because of her sex. Callahan has presented evidence of frequent use of gender-based slurs in the workplace, such as her co-workers referring to her as a whore, referring to her as "loose," and accusing her, without basis, of having sex with her male co-workers. These elements, taken together, present circumstantial evidence that Callahan was singled out because of her sex.

### C.    Retaliatory Hostile Work Environment

#### 1. Protected Activity

"[T]o engage in protected activity, the employee must, at the very least, communicate [her] belief that discrimination is occurring to the employer." *Demers v. Adams Homes of Northwest Florida, Inc.*, 321 Fed. Appx. 847, 852 (11th Cir. 2009). Here, Callahan has engaged in several instances of protected activity, beginning when she expressed concerns to Assistant Chief Johannsson on July 23, 2014. Ex. 1 at ¶9. Callahan further engaged in protected conduct when she sent an e-mail to the Internal Affairs investigator raising claims of disparate treatment on January 30, 2014. Finally, she engaged in protected conduct when she filed her EEOC charge on February 5, 3015. Ex. 11.

2.   Causation

The burden of causation can be met by showing close temporal proximity between the statutorily protected conduct and the adverse action. *Adams v. City of Montgomery*, 569 Fed. Appx. 769 (11th Cir. 2014). Courts have held that periods of several months between protected conduct and adverse employment action are sufficient to show causation. *See Embry v. Callahan Eye Foundation Hospital*, 147 Fed. Appx. 819, 832 (11th Cir. 2005) (finding two-month period between EEOC charge and reprimand and suspension stated prima facie case for retaliation).

Here, Johnson initiated a spurious investigation into Callahan a day after she threatened to file a complaint against JSO. Ex. 1 at ¶9. Furthermore, the integrity unit investigators assigned to surveil Callahan were explicitly told the "need to get this done, because Trudy is going to sue. . ." Furthermore, Callahan's transfer occurred one month after she confronted Johnson regarding how he was treating her female colleagues and two months after the conclusion of the Internal Affairs investigation into her complaint.

The City relies on *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1346 (11th Cir. 2007), which held that a three-to-four-month gap between protected conduct and adverse action could not state a prima facie case for retaliation. (Doc. 30 at 24). However, what the *Thomas* court specifically held was that such temporal proximity on its own was not sufficient to demonstrate causation. *Id.* at 1364. In addition to temporal proximity, a plaintiff may prove causation by showing a "pattern of antagonism" or that the adverse actions was the first opportunity the employer had to retaliate. *See Ward v. United Parcel Service*, 580 Fed. Appx. 735 (11th Cir. 2014).

Here, even those acts that were remote in time to Callahan's protected conduct were part of an overall pattern of antagonism that began the day after Callahan announced her intension to

18

file a complaint. It continued with further spurious disciplinary investigations, ignoring Callahan's hardship requests. Furthermore, after Plaintiff's complaint the disciplinary investigations were almost all initiated by Undersheriff Ivey who, shortly after it was announced that he would be serving as undersheriff, confronted Callahan in front of her peers and asked in a confrontational tone, "are you suing me?[5]"

**D.     Retaliation**

To establish a claim for retaliation, a plaintiff "must first establish a prima facie case by showing that[6]: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action." *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009).

1.      Adverse Employment Action

Here, Callahan's loss of 3.75% differential shift pay is sufficient on its own to be considered an adverse employment action. *Gillis v. Georgia Dep't of Corrections*¸400 F.3d 833 (11th Cir. 2005) (finding $900 reduction in pay—a 2% step-raise—was substantial enough to be an adverse employment action). However, even beyond this differential shift pay, the transfer imposed substantial hardship because it prevented Callahan from being able to care for her elderly mother during the day, a fact her supervisors were well aware of because of her transfer requests.

2.      Pretext

---

[5] Per Callahan's testimony, Ivey directly brought up her request to be transferred during the day shift during this conversation. Doc. 31-2 "Callahan Depo" at 190.
[6] Callahan adopts her causation and protected conduct argument from the prior section, as the transfer was part of an ongoing pattern of antagonism and occurred two months after internal affairs finished investigating her sex discrimination complaint.

The Defendants claim that Callahan was transferred to the day shift because she was spending excessive time at stop stations and substations, that she had received counseling and not obeyed orders, and that she requested training that could only be accommodated on the day shift. A trier of fact can reasonably infer from the falsity of an explanation that the employer is dissembling to cover up for an unlawful purpose. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000); *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005) (finding pretext was a triable issue where applicant for promotion introduced evidence refuting, among other proffered justifications, the occurrence of incidents where plaintiff was alleged to have behaved unprofessional behavior).

However, the only record of Callahan spending time at stop stations was the result of surveillance on her conducted specifically so her superiors could find a reason to punish her, because she was threatening to sue JSO. Furthermore, Callahan's activity at the stop station was not a policy violation, an indeed she was encouraged to spend time there since, as a lieutenant she does not actively patrol her zone.  Furthermore, Callahan denied that she was ever counseled for this behavior, and indeed she was told that the transfer was not performance related. As to the training, while Callahan did request training, it was denied for budget reasons and was also never offered to her once she moved to the day shift. These facts, taken in light of their place in a reoccurring pattern of antagonism toward Callahan after she engaged in protected conduct, create a jury question as to whether her transfer was retaliation.

## III.    CONCLUSION

Because the facts taken in the light most favorable to Callahan establish issues of material fact that require resolution by a jury, the Defendant's Motion for Summary Judgment should be denied.

Respectfully submitted,

_____/s/ Jesse B. Wilkison_____
Wm. J. Sheppard, Esquire
Florida Bar No.:  109154
Elizabeth L. White, Esquire
Florida Bar No.:  314560
Matthew R. Kachergus, Esquire
Florida Bar No.:  503282
Bryan E. DeMaggio, Esquire
Florida Bar No.:  055712
Jesse B. Wilkison, Esquire
Florida Bar No.:  118505
Camille E. Sheppard, Esquire
Florida Bar No.: 124518
Sheppard, White, Kachergus & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:     (904) 356-9661
Facsimile:     (904) 356-9667
Email:         sheplaw@sheppardwhite.com
COUNSEL FOR PLAINTIFF

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished to the following by Electronic Mail, this 19th day of November 2018.

**Wendy E. Byndloss, Esquire**
**Sean Granat, Esquire**
**City of Jacksonville**
**Office of General Counsel**
**117 West Duval Street**
**Jacksonville, Florida 32202**

_____/s/ Jesse B. Wilkison_____
ATTORNEY