## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

TRUDY CALLAHAN,

        **Plaintiff,**

v.                                  **Case No. 3:16-cv-01348-J-20JBT**

CITY OF JACKSONVILLE, FLORIDA,

        **Defendant.**

_____/

## O R D E R

**THIS CAUSE** is before the Court on "Defendant's Dispositive Motion for Summary Judgment and Memorandum of Law" (Doc. 30), "Plaintiff's Response to Motion for Summary Judgment" (Doc. 40), "Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment" (Doc. 48), and "Plaintiff's Surreply for Defendant's Motion for Summary Judgment" (Doc. 52).

Plaintiff's Complaint (Doc. 1) contains three counts for alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § § 2000e, *et. seq.* ("Title VII") by the Defendant: one count for Retaliation (Count I); one count for Hostile Work Environment (Count II), and one count for Retaliatory Hostile Work Environment (Count III). Upon consideration of the record evidence and the relevant case law, the Court finds the following:

## I.    BACKGROUND

Trudy Callahan works as a lieutenant for the Jacksonville Sheriff's Office ("JSO"). She has been employed by JSO since 1996. Callahan started as a patrol officer. She rose through the ranks to become sergeant in 2006, before being promoted to lieutenant in 2011. Callahan is currently assigned to the evening shift in Zone 1 and holds the rank of Lieutenant, Patrol. Her job

responsibilities include administering roll call, disseminating information, holding community meetings when necessary, acting as the assistant chief when required, monitoring the sergeants, and mentoring her subordinates. (Doc. 31-1, pgs. 35-36). In this current role, she supervises approximately 15 people. (*Id.*, pg. 39).

Callahan's service with the JSO spans more than 20 years and at least three different sheriff's administrations. She alleges that throughout her career she has been treated differently than her male colleagues, particularly when it came to the disciplinary system, a system she alleges was weaponized to harass her. She further alleges she was retaliated against for bringing discrimination claims.

What follows are the incidents Callahan alleges make out a claim for hostile work environment and retaliatory hostile work environment:[1]

- In 1998, Callahan worked for Lieutenant Coffman, who made passes at her, bragged about being an underwear model, and said derogatory things about her. Callahan met with Coffman's supervisor, Chief Bass, advised Bass she did not want to file a formal complaint, and stated she wanted Coffman kept away from her. A month later, Coffman sent her to different unit. After that, Callahan's neighbor reported to Callahan that she caught someone coming from Callahan's home. Callahan alleges she later discovered it was Detective Hyer

---

[1] In her Complaint (Doc. 1), Plaintiff alleges the first incident that forms the basis of her claims took place in 2011. This Court, in denying Defendant's Motion to Dismiss, held that her "hostile work environment claim may include incidents that began in August 2011 as part of a continuing violation." (Doc. 15). Callahan, in her Summary Judgment Response (Doc. 40), outlines incidents dating back to 1998 that she purports are part of her hostile work environment claim. While not contained in her Complaint, the Court will still consider these newly outlined allegations as part of her hostile work environment claim. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (holding that a hostile work environment claim is composed of a series of distinct acts that, together "constitute one unlawful employment practice;" and because of the collective nature of the cause of action, it does not matter that some of the acts that make up the hostile work environment claim fall outside the statutory period).

and Detective McHale of JSO. (Doc. 31-1, pgs. 339). In 2005, Detective McHale allegedly admitted to Callahan he broke into her home, "but we drew the line when they wanted us to plant drugs or contraband in your police car to give them an excuse to arrest you and get rid of you." (*Id.* at 340).

- Sometime in 2006 or 2007, a fellow supervising officer and others were singing and playing a guitar. Callahan heard her name mentioned. Later that night, another sergeant handed Callahan song lyrics about her being a whore and explained that this was what they were saying about her. Callahan went to her supervisor, and said, "I don't want to make a formal complaint, not really. It is what it is. But it's inappropriate, so it needs to stop. And he did—it stopped, and honestly me and that sergeant are fine now." (*Id.*, pg. 73).

- In October 2011, Chief Tranquille told Callahan, in sum and substance, that were she doing her job right, her officers would not be "call stacking."[2] Callahan, responded, "I don't know how long it's been since you've been on the street, but things have changed[,] and we're understaffed[,] and we have to stack calls." (*Id.*, pg. 89-90). Because of the conversation, Callahan received formal counseling. But she was not referred to Internal Affairs. (*Id.*, pg. 92). Callahan alleges that a male lieutenant who shouted at Chief Tranquille was only told to calm down. (*Id.*, pg. 93).

- On or about December 11, 2011, Chief Lendvay formally counseled Callahan for being late, hazardous driving (a citizen made a complaint), submitting incomplete reports, failing to file a "noteworthy report" on a business robbery, and the low number of curfew

---

[2] According to Callahan, call stacking is delaying the completion of an incident report you are working on to handle an urgent incident or occurrence.

violations from her squad.[3] (*Id.*, pg. 106). Callahan alleges that male lieutenants were late for monthly meetings and not punished. (Doc. 1, ¶10). Callahan was subsequently moved from Zone 4 to Zone 3 where she was supervised by Assistant Chief ("AC") Deal and Chief Brown. According to Callahan, "[her transfer] was not punishment, it was just because they had disagreements on curfew." (Doc. 31-1, pg. 107).

- In May 2012, Chief Brown filed a complaint with Internal Affairs for Callahan's failure to arrest a suspect for burglary; Callahan had determined that the individual should be Baker Acted. Another male supervisor was also reported to Internal Affairs for this incident. The State Attorney's Office initially disagreed with Callahan and charged the individual, but they later dropped the charges. Both the male supervisor and Callahan went through the grievance process. She was exonerated after investigation, but the male supervisor ended up with formal counseling. (*Id.*, pg. 117-118).

- In October 2012, Callahan was reprimanded for failing to attend a lieutenants' meeting, and for having her sergeant conduct roll call. Callahan alleges she was on approved bereavement leave during the meeting, and that it was commonplace for sergeants to conduct roll call. (*Id.*, pg. 120).

- In June 2013, Chief Brown filed a complaint with the Safety Review Board of JSO for Callahan's involvement in a May 2013 vehicle pursuit. (Doc. 42-3, pg. 2). The Safety Review Board examines crashes and pursuits and determines whether JSO policy was followed. (Doc. 31-1, pg. 136). Other officers involved in that pursuit were also reviewed

---

[3] Former Sheriff John Rutherford prioritized the enforcement of curfews as part of his crime prevention strategy. Callahan believed the policy was legally impermissible. She advised her superiors of her belief on numerous occasions and did not advocate to her squad to aggressively partake in enforcing curfews.

by the Safety Review Board. However, only Callahan's case was sent to Internal Affairs. According to Callahan, this was the first pursuit the Safety Review Board sent to Internal Affairs. She alleges male officers who violated JSO pursuit policies were *not* sent to Internal Affairs. (Doc. 40, pg. 5).

- In June of 2013,[4] Callahan learned from Lieutenant Judge that another officer called him and said, "a little birdie told me Trudy got in police pursuit, and I need to check it out." (Doc. 31-1, pg. 323). Callahan approached Assistant Division Chief ("ADC") Johnson and said,

> I'm telling you now if they file a complaint on me over this police pursuit, and start harassing me again, I'm telling you now, [Johnson]. I'm not playing this game. You signed off on it. It was a good pursuit. I'm not going to let them harass me any further.

(*Id.*) In July, Callahan realized an investigation had been opened. She called ACD Johnson and told him she was filing a complaint. (*Id.*, pg. 324). Callahan testified that the next day or so, ACD Johnson went to JSO's Integrity Unit and alleged that Callahan was having sex on duty. She was surveilled because of this allegation and was exonerated. *Id.*

- Former JSO Detective Bennett corroborated Callahan's version of events. Detective Bennett stated in approximately August of 2013, ACD Johnson requested the Integrity Unit investigate Callahan for "having sexual relations with her subordinates at the Zone 3 stop station . . . ." (Doc. 42-5, pg. 1). Bennett alleges that during the meeting either ACD Johnson or Lieutenant Dingy stated, "we need to get this done, because Trudy is going to sue Assistant Chief [] Deal." *Id.* Bennett conducted surveillance of Callahan and the Zone

---

[4] Callahan testified that this occurred in June 2014. However, upon review, it appears Callahan meant 2013, as the pursuit review paperwork she attached as Exhibit 3 to her Response (Doc. 42) indicates the pursuit took place on May 19, 2013 and was reviewed on May 29, 2013. (Doc. 42-3, pgs. 2, 4-6).

3 stop, but "did not observe anything of investigative value," so no reports were authored.
(*Id.*).

- In September of 2013, ACD Johnson gave her an informal reprimand for comments she made during a community meeting. During that meeting, Callahan tried to dissuade residents from leaving their car doors unlocked. She told residents it was like "leaving cake on the counter," in that "roaches would come at night and steal it." (Doc. 1, ¶ 21). Callahan had used the analogy on numerous occasions, but this was the first time she was disciplined. Shortly after this meeting, a male lieutenant called criminals "thugs, punks, and knuckleheads," but ACD Johnson merely laughed and the lieutenant was not reprimanded. (Doc. 1 ¶ 22). Callahan claims during a similar community meeting, ACD Johnson commented that a black male juvenile who was beaten by police deserved it because he was a "thug and a punk." (Doc. 1 ¶23).

- On September 26, 2013, Callahan filed a complaint with Internal Affairs alleging that Lendavy, Tranquille, Brown, and Deal harassed and singled her out for discipline because, she, a female, pointed out JSO's unlawful curfew practices. (Doc. 31-1; Doc. 31-3, pgs. 1-105; Doc. 1,¶ 25).[5] On January 30, 2014, Callahan e-mailed Internal Affairs investigator Lieutenant Oldham and clarified that she was raising claims of sexual discrimination. (Doc. 31-1, pg. 158). Internal Affairs completed that investigation in March of 2014 and found the allegations Callahan made to be either unfounded, not-sustained or exonerated. (Doc. 31-1, pg. 158; Doc. 31-3, pgs. 88-105).

---

[5] JSO's Internal Affairs paperwork indicates the first mention of gender discrimination was in a January 30, 2014 e-mail.

- In approximately May of 2014, another female officer told Callahan that she was at a bar/restaurant with ACD Johnson, and he put his head between her breasts. Callahan did not witness this, was not at the bar/restaurant, nor did she report the incident. (Doc. 31-1, pgs. 151-54). Callahan, however, had observed ACD Johnson demonstrating boorish behavior when he screamed at his female secretary to get him coffee. (*Id.*, pg. 155).

- In May or June of 2014, Callahan confronted ACD Johnson about, these issues.[6] ACD Johnson shouted at Callahan and told her to mind her own business. (*Id.*, pg. 155). He later cursed at Callahan for using reserve officers to try to apprehend individuals she believed to be destroying a golf course. (*Id.*, pgs. 156-57). Callahan alleges male co-workers used reserve officers "in the same deployment" but were not berated for their decision.

- As of June 1, 2014, Callahan was working on the gold midnight shift. She preferred this shift because it allowed her to care for her elderly mother during the day, and she earned an additional 3.75% per hour shift deferential. (Doc. 42-1, ¶13). On June 20, 2014, she was notified that she was being transferred to the day shift. She protested the change. (*Id.*, pgs. 157-58).

- Assistant Chief Ayoub and Chief Cook became Callahan's supervisors on the day shift. Chief Cook explained Callahan was moved because she was needed for community meetings. Cook asked Callahan to give it six months, and if she did not like it, she should come talk to her. (*Id.*, pg. 180). Later, Callahan asked for a transfer to the evening shift. Cook said it was out of her hands. (*Id.*, pg. 181).

---

[6] Callahan also alleges that Ivey called another female officer "juicy" in an apparent reference to her rear end.

- Undersheriff Senterfitt explained Callahan's transfer differently than Cook. He stated that Callahan was moved because she had issues on the night shift, including spending an excessive amount of time at the substation, and she failed to follow her supervisor's instructions. (Doc. 31-10).

- On February 5, 2015, Callahan filed a charge with the Equal Employment Opportunity Commission ("EEOC").

- In March of 2015, during a combined roll call, Chief/Director Hackney took Callahan outside and yelled at her for being on her phone. Callahan maintains that other officers were also on their phones (Doc. 31-1, pg. 184), and this conduct was in retaliation for filing her EEOC complaint.

- In June 2015, incoming Undersheriff Ivey asked her about the status of her EEOC complaint in front of colleagues at a Fraternal Order of Police Meeting. Callahan alleges the exchange with Undersheriff Ivy went something like this:

  **Ivey**: Hey I don't know if you know, but – I don't know if you've heard, I'm going to be the new undersheriff.
  **Callahan**: Yes, sir, I understand
  **Ivey**: "So I was wondering you know, what's going on with that EEOC—I mean do you have like an EEOC complaint? Are you suing the department? Like what exactly is going on?
  **Callahan** said she looked at him and did not say anything
  **Ivey**: " You put in for [] Gayle's spot; right? You want[Gayle's]—because I know there is something about you put in for [Gayle's] spot because you need a later watch because stuff is going on with your family. But I know you have an EEOC. I mean, are you suing us? Are you suing me? Are you suing the department? What are you doing?

  (*Id.*, pgs. 189-90).[7]

---

[7] Undersheriff Ivey testified in his deposition that he simply asked Callahan, "Hey is it true you filed a complaint." (Exhibit 31-7, pg. 16).

8

Callahan explained the encounter made her "really upset" and "mad" so she left the meeting. (*Id.*, pg. 191). "It kind of felt like, you know 'if we do you a favor, maybe you'll do us a favor,' and I just did not appreciate it." (*Id.*) Callahan subsequently added to her EEOC complaint. (*Id.* at 191).

- In July of 2015, Callahan was moved back to the night shift (*Id.* at 176) filling Gayle's vacancy.

- On May 5, 2016, an anonymous complaint was made to Integrity Office about a "your momma" joke Callahan told while on duty. Callahan maintains these kinds of jokes are typical, but she was singled out. (*Id.*, pgs. 195-196). She further alleges that Undersheriff Ivey's son, who was training with Callahan's squad, told his father about the joke, and it resulted in the GPS investigation described below. (Doc. 42-1, ¶ 19).

- Callahan uses a "take-home" vehicle that belongs to JSO. (*Id.*, pg. 200). Unknown to Callahan at the time, a GPS tracker was put on her car on May 25, 2016. (*Id.*, pg. 196). She maintains she is the only person that has been tracked via GPS for no legitimate purpose (location records would not prove whether she told a joke) (*Id.*, pg. 198). As a result of the GPS tracker, she was found out of her work zone one third of the time. (*Id.*, pg. 203).

- On January 19, 2016, Internal Affairs launched an investigation after Undersheriff Ivey alerted them to a series of social media posts made by Callahan. The postings were on Instagram account "truds137" and were featured on the local news. Plaintiff claimed she did not personally author the postings, but all of them contained racially charged commentary and/or memes. For example, one meme posted by Callahan had a sketch of an African American male with the caption, "The police really expect somebody to find this nigga. I know 6 niggas that look like this." (Doc. 31-6, pg. 159). In another Instagram

post, Callahan posted a photograph of an African American male laying on top of a broken, chain-linked fence. Callahan commented, calling such fence usage, a "hood hammock." (*Id.*, pg. 161). In a different posting, a picture of what appears to be an African American man, standing in line in a drive-up ATM. Callahan commented, "When you need money to get gas for the car you can't drive up to the ATM." (*Id.*, pg. 160). Callahan was issued a ten-day suspension and a written reprimand (*Id.* at 180). Her suspension was later reduced to two days. Callahan argues that her punishment was unfair because two other male officers who acted similarly or worse were not disciplined. (Doc. 40, pg. 11).[8]

Callahan alleges these incidents demonstrate she has been "frequently, targeted, investigated and disciplined" that the allegations were "spurious" for conduct that her "male colleagues also engaged [in], but were not investigated or disciplined." (Doc. 42-1, ¶ 5). She alleges that despite, being exonerated on some of the charges,

> the process of being investigated and interrogated by internal affairs and the integrity unit is highly time consuming and stressful. These investigations can last more than six months, which entails long interrogations by integrity or internal affairs officers, interrogations of my subordinates and colleagues, and close monitoring of my personal whereabouts or actions while on the job. Furthermore these investigations are often reported on by the press and subject to public scrutiny. If the violations are found to be sustained, even if the outcome is only a formal counseling, the results of the investigations become public record. Furthermore, being the subject of these investigations is highly stressful, and I have witnessed, and I have witnessed officers (including myself) suffer physical symptoms such as weight loss, trouble sleeping, and dental issues from grinding teeth as a result of stress.

---

[8] One officer posted a series of violent posts to social media. The other stood up during a defendant's arraignment and made a comment and gesture, strongly implying that the defendant would be raped in jail. (Doc. 40). Callahan claims the social media posting male officer received a lesser, level 1 reprimand, and no suspension; and that no action was taken against the other officer.

(Doc. 42-1, ¶6 ).

JSO has the duty to investigate all allegations of misconduct on the part of their officers, regardless of the source. This remains true even if a complaint is eventually found to be unfounded. There are various types of discipline. (Doc. 31-6). According to Undersheriff Ivey, officers are subject to a progressive discipline policy, which is designed to encourage them to correct their behavior and avoid harsh consequences. (*Id.*, pgs. 105-108). "Counseling" is different from discipline. Counseling can be either formal or informal and is designed to train and improve behavior. Informal counseling can be as simple as, "don't do that again." Formal counseling is a verbal conversation which is reduced to writing and signed. (Doc. 31-1, pg. 69). Neither types of counseling are considered discipline. (*Id.*, pg. 87). Discipline is considered to be a level 1 written reprimand, level 2 written reprimand, demotion, suspension or termination. (Doc. 31-6, pgs. 105-106). As a Lieutenant, Callahan chooses to do more informal counseling with her subordinates and only issues formal discipline when absolutely necessary. However she does have the flexibility to take harsher action. (Doc. 31-1, pgs. 48-49).

In sum, Callahan alleges that JSO subjected her to a hostile work environment based on gender by choosing to enforce JSO policy more stringently and aggressively with her and transferring her. She also contends that after she complained about disparate treatment, she was retaliated against.

## II.   SUMMARY JUDGMENT STANDARD

Summary Judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing the Court there is an absence of a genuine issue of material fact to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A

party seeking summary judgment has the initial responsibility of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (quoting Fed. R. Civ. P. 56(e)). Once the moving party has met its burden, the non-moving party must present specific facts showing there is a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).

An issue of fact is "genuine" if the record could lead a trier of fact to find for the non-moving party. *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). A "material" fact is one that "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When reviewing a summary judgment motion, "'The district court should resolve all reasonable doubts about the facts in favor of the non-movant and draw all justifiable inferences . . . in his favor.'" *Hickson Corp. v. Northern Corssarm Co., Inc.*, 357 F.3d 1256 (11th Cir. 2004) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991)) In so doing, a Court cannot weigh conflicting evidence or determine issues of credibility. *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011). Instead, the Court is "'limited to deciding whether there is sufficient evidence upon which a [fact-finder] could find for the non-moving party.'" *Georgia State Conference of NAACP v. Fayette Cty Bd. of Com'rs*, 775 F.3d 1336 (11th Cir. 2015) (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003)).

III.   **ANALYSIS**

    a.  **Hostile Work Environment**

"A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To prove she was subject to a hostile work environment under the law, Callahan must show: (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment was based on her protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and the (5) the employer is responsible for such environment under a theory of either direct or vicarious liability. *Id.*

Callahan has shown that she belongs to a protected group and has been subject to unwelcome harassment. The Court harbors some reservations as to whether the harassment Callahan complains of was because of her gender. *See Gupta v. Florida Bd. Of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)("Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor of the offended party (the plaintiff), are not counted."). However, even if the harassment she received was because of her gender, it was not sufficiently "severe or pervasive" to sustain a hostile work environment claim. *Cheatham v. DeKalb Cty., Georgia*, 682 Fed. App'x. 881, 888 (11th Cir. 2017).

For harassment to be "severe or pervasive," a plaintiff must prove it was both subjectively and objectively hostile. *Id.* An employee must subjectively believe the harassment is severe enough

to alter the terms or conditions of her employment; and her subjective perception must be objectively reasonable. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010).

When examining whether conduct was objectively sufficiently severe or pervasive, the Court must look at all the circumstances, including (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct was physically threatening or humiliating (versus a mere offensive utterance), and (4) whether the conduct unreasonably interfered with the employee's job performance. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998); *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008). The Eleventh Circuit approaches these factors by employing "a totality of the circumstances approach, instead of requiring proof of each factor individually." *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238 (11th Cir. 2004)(quoting *Miller*, 277 F.3d at 1276).

Even treating all the allegations made by Callahan, outlined herein, as harassment, Defendant's actions were not frequent enough to constitute severe or pervasive conduct. Over approximately 18 years, between 1998 and 2016, Callahan suffered approximately 17 instances of harassment. Giving Callahan the benefit of disregarding the three incidents between 1998 and 2006 due to the large time gap between the first and fourth incidents,[9] Callahan suffered approximately 14 instances of harassment over a five-year period, from 2011 to 2016. This does not rise to the level of sufficiently severe and pervasive. *Cf. Husley*, 367 F.3d at 1248 (11th Cir. 2004)(holding conduct occurring at least eighteen times during a two to two-and-a-half-week period was

---

[9] The first allegation of harassment in took place in 1998. The fourth incident took place in 2011, 13 years later.

frequent); *Miller*, 277 F.3d at 1276-77 (holding severe and pervasive conditions present where colleagues called plaintiff racially offensive names three to four times per day).

The Court's finding regarding frequency is in accord with the law in the Eleventh Circuit. In *Barrow v. Georgia Pacific Corp.*, a plaintiff employee saw displays of the rebel flag, the letters "KKK" on the bathroom wall and on a console at work, and a noose in an employee's locker. 144 Fed. App'x. 54 (11th Cir. 2005). He was also called a racial slur three times in one year, called "boy" repeatedly, and physically threatened using racially derogatory terms two or three times. *Id.* A supervisor called him a racial slur and threatened him with violence if he looked at a white female, and two other supervisors called him nicknames based on his race once. *Id.* The Eleventh Circuit held these were isolated, sporadic instances of racial harassment over his more than fourteen-year employment with the company, and summary judgment was properly granted. *Id. See also Mendoza v. Borden*, 195 F.3d 1238, 1249 (11th Cir. 1999)(holding five discrete acts of harassment, including a single instance of physical contact, plus constant following and staring at Plaintiff in a very obvious way over an eleventh-month period were too infrequent to alter the conditions under which the plaintiff had to perform her job).[10]

Additionally, the conduct Callahan complains of is not severe enough to be actionable. *See Faragher*, 524 U.S. at 778 (noting the Supreme Court has clarified that conduct must be extreme for it to amount to a change in the terms and conditions of employment). "Title VII does not prohibit 'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.'" *Id.* (quoting *Oncale v. Sundower Offshore Serv.*, 523 U.S. 75, 81 (1998)). Even if JSO did not have proper grounds for the counseling and/or

---

[10] The Court also held the same conduct was not severe enough to establish a hostile work environment.

discipline that Callahan received, JSO's conduct did not rise to the level that a reasonable person would find hostile or abusive. While it may be upsetting to be repeatedly questioned and investigated, it does not rise to the level of actionable harassment, particularly, where the record demonstrates that counseling, both informal and formal is a tool frequently used by officers in JSO, including Callahan. And, Callahan was exonerated at the conclusion of many of the investigations. *Compare Hulsey*, 367 F.3d at 1248 (finding conduct objectively severe where the employee's supervisor made direct and indirect propositions for sex, followed her into a restroom, and attempted to touch her chest, pull her pants off, put his hands down her pants and used other employees to hold her while he attempted to grope her), *with Adams v. Austal, U.S.A., LLC.*, 754 F.3d 1240, 1254 (11th Cir. 2014) (holding conduct was not sufficiently severe or pervasive where an employee saw his coworkers wearing the Confederate flag regularly and racist graffiti in the bathroom he used daily, heard people say racial slurs a few times, and heard about a noose being left in a breakroom).

The facts of *Cheatham* are like those before the Court. 682 Fed. App'x. 881. Plaintiff there was a female fire medic. *Id.* She alleged she was subjected to unlawful retaliation and a hostile work environment. *Id.* To support her action, she claimed that fellow male officers defecated in the women's restroom; a captain commented that the only reason a woman should be in the fire service is to cook and do clerical work and that he did not want a woman riding on his firetruck; plaintiff was denied leave request for leave because other male medics already requested time off; she filed several formal complaints and grievances never addressed by the county; and a chief told her that she could revoke one of her complaints and if she did not, she might be suspended for thirty days. *Id.* The Eleventh Circuit held, that other than the comments by the captain, there was no evidence that these behaviors were based on Plaintiff's female status. *Id.* at 888 (citations

omitted).[11] Further, the Court reasoned that even if the treatment the plaintiff received was motivated by sex, it was not sufficiently "severe or pervasive" to support a hostile work environment claim. *Id.*

The heart of Callahan's claim is that JSO weaponized the disciplinary and counseling process to harass her. When examining the alleged instances of harassment here and asking whether an objective person would view them as severe and pervasive, the Court must consider that JSO, as a law enforcement agency, has a legitimate interest in the performance of their officers and a duty to investigate complaints. In many of the cases where the Eleventh Circuit found conduct sufficiently severe and pervasive, the conduct had no legitimate purpose and was unrelated to any task of the entity. The Eleventh Circuit has explained that written counseling, oral reprimands, and criticisms of an employee job performance that do not lead to "tangible job consequences will rarely form a permissible predicate for a Title VII suit." *Davis* v. *Town of Lake Park*, 245 F.3d 1232, 1241-42 (11th Cir. 2001). While *Davis* was analyzing a retaliation claim, not a hostile work environment, its commentary is instructive here:

> Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace. Expanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit an employer's ability to maintain and improve job performance. Federal courts ought not be put in the position of monitoring and second-guessing the feedback that an employer gives, and should be encouraged to give, an employee. Simply put, the loss of prestige or self-esteem felt by an employee who receives what he believes to be unwarranted job criticism or performance review will rarely—without more—establish the adverse action

---

[11] The Plaintiff in *Cheatham* believed that much of the hostility she faced was because she participated in an investigation into whether another employee knowingly served a food to a colleague that the colleague was allergic to. She created a patient care report which contradicted a supervisor's explanation for the incident.

> necessary to pursue a claim under Title VII's anti-discrimination clause.

*Id.* at 1242. This is not to say that an employee subjected to constant discipline and feedback could never make out a claim for hostile work environment under Title VII. The Court however finds that a matter of law, here, the conduct complained of was not severe and pervasive.

Furthermore, the actions of the Defendant did not disturb Callahan's job performance.[12] Callahan has not pointed to any specific way that JSO's conduct "unreasonably interfered" with her "job performance." *Faragher*, 524 U.S. at 787-88.

Her performance reviews have remained basically consistent throughout her employment. Her deposition testimony demonstrates that her day-to-day work has not been affected, and she still takes pride in teaching and leading her subordinates.

The only JSO interference Callahan identifies relates to compensation and the disruption of her availability to care for her elderly mother, not job performance. She was promoted twice during her career, still holds the rank of lieutenant, and has never been demoted or denied a step pay increase. When Callahan was switched to the day shift, she maintained her position and was required to perform the same duties. (Doc. 31-1, pg. 160). According to Callahan's testimony, in 2013,[13] the last full calendar year prior to her transfer to the day shift, she made $2,592 in shift differential (the premium added to base salary for working the night shift). Her total salary at JSO in the year 2013 was $98,183. In 2014,[14] a portion of which she was reassigned to the day shift,

---

[12] Here, the Court finds some of the alleged conduct of Callahan's superiors to be distasteful, petty, and beneath the dignity of the badge. However, for the reasons set forth herein, this behavior is not actionable harassment.

[13] These numbers are based on Callahan's December 20, 2013 pay notice.

[14] These numbers are based on Callahan's December 19, 2014 pay notice.

Callahan made $1,579 in differential pay. Her total salary in 2014 was $104,540. In 2015,[15] a portion of which she was assigned to the day shift, Callahan made $1,262 in differential pay. Her total salary in 2015 was $104,356. In 2016,[16] a year in which she was assigned to the night shift, her differential pay was $2,873. Her total salary in 2016 was $108,881. Based on these numbers, for calendar years 2014 and 2015, Callahan lost approximately $2,300 in shift differential pay.[17] (Doc. 31-2, pgs. 230-239). The record demonstrates that shift differential payments resumed when she returned to the night shift to even higher than it was before her transfer. (*Id.*)

The Defendants are entitled to judgment as a matter of law on Count II of Plaintiff's complaint, Hostile Work Environment.

### b. Retaliatory Hostile Work Environment

To state a claim for retaliatory hostile work environment, Callahan must establish she (1) engaged in statutorily protected activity; (2) has been subject to unwelcome harassment; (3) the harassment was based on her engaging in protected activity; *and* (4) the harassment was sufficiently severe or pervasive to alter the terms and condition of her employment. *Kelly v. Dun & Bradstreet, Inc.*, 641 Fed. App'x. 922, 923 (11th Cir. 2016). Because this Court held that Callahan's alleged harassment was not sufficiently severe or pervasive to alter the terms of her employment, the Defendant is likewise entitled to summary judgment on Count III, Retaliatory Hostile Work Environment.

---

[15] These numbers are based on Callahan's December 18, 2015 pay notice.

[16] These numbers are based on Callahan's December 30, 2016 pay notice.

[17] Although in should be noted, her total salary for the years 2014 and 2015 were greater than 2013, a year in which she was assigned to the night shift.

### c. Retaliation

In Count 1 of her Complaint, Callahan alleges that she was retaliated against in violation of Title VII by "filing a complaint with internal affairs alleging sex discrimination in JSO's disciplinary practices and complaining to ACD. Johnson regarding his harassment of women. As a result of Plaintiff's complaints, JSO transferred Plaintiff to the day shift." (Doc. 1, ¶ ¶ 64, 65).

In order to establish a *prima facie* claim for retaliation, Callahan must establish (1) she engaged in a statutorily protected activity, (2) she suffered a materially adverse action, and (3) there was some relation between the two events. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2011). Once Callahan establishes a *prima facie* case, the burden shifts back to the defendant to proffer a legitimate, nonretaliatory reason for the challenged employment action. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). If the defendant makes this showing, the burden shifts back to Callahan to demonstrate by a preponderance of the evidence that the employer's explanation is merely a pretext for retaliation. *Id.*; *Goldsmith*, 513 F.3d at 1277.

Callahan claims she engaged in statutorily protected activity both under the "participation clause" of Title VII, by filing a complaint with internal affairs alleging sex discrimination in JSO's disciplinary policies, and the "opposition clause" of Title VII, by complaining of ACD Johnson's harassment of women.[18]

The participation clause "protects proceedings and activities which occur in conjunction with or after the filing a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the

---

[18] The participation clause of Title VII, "covers participation in "an investigation . . . under this subchapter,' that is, an investigation under subchapter VI of Chapter 21 of Title 42 (42 U.S.C. § § 2000e-2000e-17). 42 U.S.C. § 2000e-3(a)." *E.E.O.C. v. Total Sys. Servs.*, 221 F.3d 1171, 1174 (11th Cir. 2000).

EEOC." *E.E.O.C. v. Total Sys. Servs.*, 221 F.3d 1171, 1174 (11th Cir. 2000). Thus, because the retaliation Plaintiff complains of was not the result of her filing an EEOC complaint, her participation claim is not viable. *See Towsend v. Benjamin Enters., Inc.*, 679 F.3d 41 (2d Cir. 2012) ("Every Court of Appeals to have considered this issue squarely has held that participation in an internal employer investigation not connected with a formal EEOC proceeding does not qualify as protected activity under the participation clause.")(citations omitted).

Under the opposition clause, an employer may not discriminate against an employee for opposing any practice made unlawful under Title VII. *Branscomb v. Sec'y of Navy*, 461 Fed. App'x. 901, 906 (11th Cir. 2012). Here, the Court will assume Callahan engaged in a statutorily protected activity (complaining of ACD Johnson's treatment of women), and she suffered a materially adverse action (change of shift resulting in a reduction of pay for one year before being transferred back to the night shift). However, Callahan fails to establish the third prong of the *prime facie* case, a causal link between the protected activity and the adverse employment action. *Cheatham*, 682 Fed. App'x. at 886. "To establish such a causal link, the employee must prove that 'the desire to retaliate was the but-for cause of the challenged employment action.'" *Id.* (quoting *Booth v. Pasco Cty.*, 757 F.3d 1198, 1207 (11th Cir. 2014)). Callahan cannot show, based on the record, that a retaliatory intent was the "but-for" reason for her transfer. *Univ. of Texas Southwestern Med. Ctr. v. Nasser*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."). Callahan's conduct and the series of disagreements outlined herein that predate Callahan's transfer, plus the evidence in the record that support Undersheriff Senterfitt's

reasons for transferring Callahan (discussed below), illustrate her complaints about ACD Johnson were not the "but for" cause of the adverse employment action.

Moreover, even if Callahan established a *prima facie* case, Callahan failed to create a genuine issue of material fact as to whether the reasons JSO gives for her dismissal are pretextual.

Undersheriff Senterfitt, in his declaration, states that in June 2014, he made the decision to transfer Callahan to the day shift because she failed to follow her supervisor's work instructions and failed to conform to JSO standards. (Doc. 31-10, pg. 2). Undersheriff Senterfitt points to complaints he received about Callahan, including that she was spending too much time at the substation, a place where officers can go to write reports and use the restroom, and she asked officers to stay at the substation for no reason. The JSO Assistant Chiefs, Chiefs, and Directors typically do not work after business hours, after 5:30 p.m. or 6 p.m. on weekdays; nor do they work on weekends and holidays. (Doc. 31-10; pgs. 43, 162). Consequently, after business hours, lieutenants, like Callahan, are often the highest-ranking officers on duty. (*Id.*).[19] Because real-time supervision or monitoring of a lieutenant on the night shift difficult, Undersheriff Senterfitt moved Callahan to the day shift so she could be more closely supervised. (Doc. 31-10, ¶ 6). He also noted that Callahan herself had requested more training, and this was more of a possibility on the day shift. *Id.*

"In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's preferred non-discriminatory reasons

---

[19]*See also* Doc. 31-10, ¶ 6 (Undersheriff Senterfitt states, "During the midnight shift, lieutenants are the highest- ranking members of the Jacksonville Sheriff's Office on duty. Lieutenants are supervised by Assistant Chiefs, who generally work regular business hours and are not on duty much of the midnight shift.").

is pretextual." *Chapman v. Al Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000). Callahan's own

deposition testimony supports Undersherriff Senterfitt's proffered reasoning.[20] Callahan testified:

> **Question**: When you were on midnights, did you spend time at The
> Preserves Clubhouse?
> **Callahan**: Yes, sir. It is a Zone 3 stop station and it's located about
> a mile-and-a-half, two miles, from what was then the Zone 3 stop
> station.
> **Question**: How much time would you normally spend at The
> Preserves?
> **Answer**: The majority of my shift, unless I had to go to a call that a
> lieutenant was required to go to.
> **Question**: Did you ever request other officers come hang out with
> you at The Preserves?
> **Answer**: No, but I did bake cookies, and I did make food to show
> them how much I appreciated them, so I would tell them to come up
> and eat and . . .
> **Question**: Did you bake cookies at The Preserves clubhouse—
> **Answer**: Yea, they had –
> **Question**: --while you were on duty?
> **Answer**: Uh-huh. They had a full kitchen in there.
> **Question**: How often would you bake cookies at The Preserves?
> **Answer**: Geez, I don't know. I couldn't tell you. I mean, I also
> cooked a full Christmas dinner and brought it there and just heated
> it up there. I cooked dinner every now and then just to show my
> appreciation for people.
> **Question**: Did you bake cookies once a month?
> **Answer**: Maybe.[21]

(Doc. 31-2, pgs. 267-68).

The record also suggests that ACD Johnson counseled Callahan for failing to conform to

work standards, for comments Callahan made at a community meeting, decisions about using

reserve officers, and improper radio procedures (Doc. 31-2, pg. 261-263; Doc. 31-3, pg. 259). The

---

[20]*Chapman*, 229 F.3d at 1030 (explaining that once a defendant articulates a nondiscriminatory reason for the challenged employment action, the plaintiff has the opportunity to come forward with evidence sufficient to permit a reasonable factfinder to conclude the employer's reasons were not the real reasons for the employment action).

[21] Callahan also testified that she did workout videos at The Preserve; and another officer would come on her lunch break and do exercises for approximately 30 minutes. (Doc. 31-2, pg. 268).

record supports Undersheriff Senterfitt's reasons for transferring Callahan to the day shift. The decision to transfer an employee is basically a business decision, and "this decision, as with most business decisions, is not for the courts to second-guess as a kind of super-personnel department." *Total Sys. Servs.*, 221 F.3d at 1176. *See also Chapman*, 229 F.3d at 1030 ("An 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'")(quoting *Nix v. WLCY Radio/Radhall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)).

Callahan has failed to meet the Defendant's proffered reasons "head on" and rebut them. *Chapman*, 229 F.3d at 1030. Therefore, summary judgment is granted on Count 1, the claim for Retaliation under Title VII.

ACCORDINGLY, it is **ORDERED**:

1. Defendants' Motion for Summary Judgment (Doc. 30) is **GRANTED**;

2. The Clerk is directed to terminate any pending motions, enter Judgment in favor of Defendant and close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 15 day of March 2019.

HARVEY E. SCHLESINGER
UNITED STATES DISTRICT JUDGE

Copies to:
Jesse B. Wilkison, Esq.
Matthew R. Kachergus, Esq.
Bryan E. DeMaggio, Esq.
William J. Sheppard, Esq.
Elizabeth L. White, Esq.
Sean Bryan Granat, Esq.
Wendy E. Byndloss, Esq.